**FILED**

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**OCALA DIVISION**

2011 JUN -3 PM 1: 30

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FL
OCALA FLORIDA

**ICAP SECURITIES USA, LLC**,
a foreign limited liabiliy company,
**ICAP CAPITAL MARKETS, LLC,**
a foreign limited liability company,

Plaintiffs,

v.

Case No.: 5:11-cv-330-oc-32JBT

**TERRY BLACKWELL** and
**BEVERLY BLACKWELL**,
individually, and as trustees of the
**BLACKWELL FAMILY TRUST**,

Defendants.

_____ /

## MOTION FOR PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW

Plaintiffs, **ICAP SECURITIES USA, LLC**, a foreign limited liabiliy company,

**ICAP CAPITAL MARKETS, LLC,** a foreign limited liability company, by and through

undersigned counsel and pursuant to Rule 65 of the Federal Rules of Civil Procedure, other

applicable Rules of Civil Procedure and other applicable law, hereby files this *Motion for*

*Preliminary Injunction* and in support thereof, states as follows:

1.      TERRY BLACKWELL and BEVERLY BLACKWELL, individually, and as

trustees of the BLACKWELL FAMILY TRUST (hereinafter collectively referred to as "**the**

**Blackwells**") filed an arbitration claim (the "**FINRA arbitration claim**") against **ICAP**

**SECURITIES USA, LLC ("ICAP Securities")**, a foreign limited liabiliy company, **ICAP**

**CAPITAL MARKETS, LLC ("ICAP Capital"),** a foreign limited liability company

(collectively referred to herein as "**Plaintiffs**").

2.    The Blackwells filed their arbitration claim with the Financial Industry Regulation Authority ("**FINRA**") on or about January 17, 2011, which is scheduled to occur in this District.   The Plaintiffs' response to the FINRA arbitration claim was due on or before Friday, March 18, 2011. However, the Plaintiffs and counsel for the Blackwells entered into a Stipulation whereby the FINRA arbitration is stayed pending this Court's ruling on this Motion.

3.    In this Motion, the Plaintiffs seek a preliminary and, ultimately, permanent injunction, which stays all proceedings in the FINRA arbitration claim and restrains and enjoins the Blackwells from proceeding forward with any arbitration claim.

4.    This Motion is made on the grounds that immediate and irreparable loss, damage and injury will result to the Plaintiffs unless the Blackwells are (1) enjoined from proceeding with the FINRA arbitration claim and (2) all proceedings in the FINRA arbitration claim are stayed, pending a determination of the Plaintiffs' Motion for Preliminary Injunction.

5.    This Motion is supported by the Affidavit of Joel Ewusiak ("**Ewusiak Affidavit**"), the Affidavit of Perry Kleemann ("**Kleemann Affidavit**"), the Affidavit of ICAP Securities USA, LLC ("**ICAP Securities Affidavit**"), the Affidavit of ICAP Capital Markets LLC ("**ICAP Capital Affidavit**"), the Affidavit of Priscilla Sowa ("**Sowa Affidavit**") and the Affidavit of Paul Schmidt ("**Schmidt Affidavit**"). These Affidavits (and their accompanying exhibits) are filed contemporaneously herewith pursuant to a Notice of Filing ("**NOF**").

6.    As set forth herein and as supported by the Ewusiak Affidavit, the ICAP Securities Affidavit and the ICAP Capital Affidavit:

a.    The Plaintiffs are substantially likely to prevail on the merits, because (i) no agreement to arbitrate exists between any of the Parties; (ii) no FINRA rules or regulations provide for arbitration between the Blackwells and the Plaintiffs; and (iii) even if a right to arbitration existed, the Blackwells, by initiating a lawsuit[1] in this Court (that alleges similar claims to those raised in the FINRA arbitration claim) on or about May 11, 2009 and litigating that lawsuit for approximately one year and three months through the close of discovery and the filing of summary judgment motions, knowingly and voluntarily waived the right to arbitrate their claims.

b.    The Plaintiffs will suffer irreparable harm if the Blackwells are not enjoined from proceeding with the FINRA arbitration claim and the FINRA arbitration claim is not temporarily and permanently stayed;

c.    The failure to restrain and enjoin the FINRA arbitration from proceeding forward will result in harm to the Plaintiffs that substantially outweighs any damage to the Blackwells, particularly given the Blackwells do not and never have even possessed a right to arbitration; as a result, a balancing of the hardships in determining whether to grant this Motion tips decidedly in favor of the Plaintiffs;

---

[1] The prior lawsuit is described in more detail *infra.*

*and*

d.   The entering of the injunction will not disserve or be adverse to the public interest in any manner.

7.   For the reasons set forth herein, this Court should immediately grant this Motion, enter a preliminary injuction order that enjoins the Blackwells from proceeding forward with the FINRA arbitration claim and stays all proceedings related thereto.

## MEMORANDUM OF LAW

## I.   INTRODUCTION

### a.   Approximately Twenty Months Before Filing the FINRA arbitration claim, the Blackwells Initiated and Prosecuted a Lawsuit Asserting the Same Claims

On or about May 11, 2009, the Blackwells voluntarily and intentionally initiated a lawsuit, in the Circuit Court, Fifth Judicial Circuit, in and for Lake County, Florida, styled *"Terry R. Blackwell and Beverly D. Blackwell, Individually, and Terry R. Blackwell and Beverly D. Blackwell as Trustees Of The Blackwell Family Trust, v. Perry Kleemann and ICAP Securities USA, LLC,* Case No. 2009 CA 2803." (hereinafter the "**lawsuit**"). *A copy of the lawsuit is attached to the Complaint as "Exhibit A" and incorporated herein by reference.* The lawsuit alleged that Perry Kleemann ("**Kleemann**") and ICAP Securities USA, LLC ("**ICAP Securities**") violated Florida's securities laws in connection with Kleemann's sale of investments, namely a "Joint Participation Agreement" ("the **JPA**") and a "Series A Investment Contract" ("the **SAIC**"). On June 22, 2009, the lawsuit was removed by Kleemann and ICAP Securities to the United States District Court for the Middle District of Florida, Ocala Division (hereinafter the "**Federal Court**") [Doc. No 1 of Case No. 5:09-CV-278].

The Blackwells actively and substantially participated in the lawsuit by, among other actions, filing and responding to pleadings, propounding and responding to written discovery, and providing sworn testimony by way of affidavits and depositions. See Docket for Case No. 5:09-CV-278; see also Ewusiak Affidavit at ¶¶ 9-11.  At no time during the pending of the lawsuit did the Blackwells mention or demand arbitration of their claims.

On or about August 6, 2010, nearly one year and three months after the Plaintiffs initiated the lawsuit, the Federal Court dismissed the lawsuit for lack of jurisdiction over ICAP Securities and Kleemann. *A copy of the Federal Court's Report and Recommendation, Order, and Final Judgment are attached to the Complaint as "Composite Exhibit B" and incorporated herein by reference.* [Doc. No. 42, 49 and 50 for Case No. 5:09-CV-278].

In support of its dismissal of the lawsuit, the Federal Court ruled, and found, among other things:

a.  "There is nothing in the Complaint, the exhibits filed by Plaintiffs, or in the affidavit filed by Plaintiffs, that alleges or suggests that Kleemann was employed by or an agent of ICAP or that Kleemann received any compensation relating to Plaintiffs' purchases of the investments.  In the affidavit, filed by ICAP in support of its motion to dismiss, ICAP avers that the JPA and the SAIC were not sold by ICAP and that ICAP did not receive any compensation for the sale of the JPA and the SAIC." *Id., pages 3 & 4.*

b.  "The only information offered by Plaintiffs in response to ICAP's motion – marginally relevant to ICAP's activities and contacts in Florida – is that ICAP's name appears in the confidentiality statement at the end of an email, and is part of the email address that Kleemann used to communicate with the Plaintiffs.  There is no other information or sworn statements filed by Plaintiffs that either addresses or contradicts French's sworn statement that ICAP neither sold nor offered to sell the JPA or the SAIC or that ICAP has no business connections to Florida or the Plaintiffs." *Id., page 5.*

c.   "Plaintiffs have failed to offer any evidence or even attempt to rebut the sworn assertion of ICAP that it does not conduct any business activities in Florida nor does it conduct a business venture in Florida. For example, in the French affidavit, ICAP avers that it did not solicit or sell the investments, that it has no offices or employees in Florida, and most notably, that it does not even engage in business with individuals, whether in Florida or elsewhere." *Id., pages 6 & 7.*

d.   "Although Plaintiffs allege that *defendant Kleemann* solicited the sale of, and sold the securities 'through the use of the telephones and email systems of Defendant ICAP,' the Plaintiffs fail to allege any specific conduct on the part of ICAP related to the sale and solicitation of the investments to the Plaintiffs." *Id., page 10.*

e.   Accordingly, even drawing all reasonable inferences in favor of the Plaintiffs, the Complaint fails to allege any facts connecting ICAP to the sale and solicitation of the securities to Plaintiffs in Florida and fails to demonstrate any connection whatsoever between ICAP and the State of Florida." *Id., page 11.*

f.   "The only facts alleged by Plaintiffs relating to ICAP are that Kleemann used ICAP's phone and email to solicit in Florida. Even assuming, for purposes of this motion, that Kleemann used the phones and email of ICAP with their permission such conduct is far short of demonstrating that ICAP's conduct was equivalent to purposeful availment. Indeed, based upon the unrebutted sworn statement from ICAP, ICAP does not sell to individual consumers (like the Blackwells) but rather markets bonds and derivatives to major dealers as an intermediary in inter-dealer trades. Thus, there are no allegations in the Complaint nor have Plaintiffs produced any evidence suggesting that the conduct and activities of ICAP demonstrate that ICAP purposefully availed itself of the privilege of conducting business in Florida." *Id., page 13.*

The Blackwells did not appeal the dismissal of the lawsuit by the Federal Court.

As explained more fully in the Ewusiak Affidavit, ICAP Securities paid over $75,000.00 in legal fees and costs in defending and litigating the lawsuit and a related lawsuit filed in the same Court. [Case No. 5:09-cv-277]. See Ewusiak Affidavit at ¶¶ 7, 17; ICAP Securities Affidavit; ICAP Capital Affidavit.

**b. The FINRA arbitration claim**

On or about January 17, 2011, the Blackwells initiated a securities arbitration proceeding before the Financial Industry Regulatory Authority ("**FINRA**"), in Orlando, Florida, styled *"Terry R. Blackwell and Beverly D. Blackwell, Individually, and Terry R. Blackwell and Beverly D. Blackwell as Trustees Of The Blackwell Family Trust, v. ICAP Securities USA, LLC, and ICAP Capital Markets, LLC,* Case No. 11-00246." (hereinafter the "**FINRA arbitration claim**"). *A copy of the FINRA arbitration claim is attached to* the Complaint as *"Exhibit C" and incorporated herein by reference.* Similar to the lawsuit, the FINRA arbitration claim alleges that Kleemann, ICAP Securities and ICAP Capital violated Florida's securities laws, and other common laws, in connection with Kleemann's sale of investments, namely the JPA and the SAIC.

The Blackwells have named ICAP Capital Markets, LLC ("**ICAP Capital**") as a party in the FINRA arbitration claim. However, the Blackwells have not identified ICAP Capital in their FINRA arbitration submission agreement. *A copy of the FINRA arbitration submission agreement is attached to the Complaint as "Exhibit D" and is incorporated herein by reference.* As of the date of filing the Complaint in this Action and this Motion, ICAP Capital, although named as a party, has not been served by FINRA with the arbitration claim. See ICAP Capital Affidavit.

Prior to the filing of the FINRA arbitration claim in January 2011, the Blackwells never gave the Plaintiffs any indication that the Blackwells were considering or intended to pursue their claims in arbitration. See ICAP Capital Affidavit; ICAP Securities Affidavit.

As set forth herein, the FINRA arbitration claim was initiated over one year and eight months after the initiation of the lawsuit and over five months after the dismissal of the lawsuit.

## II.   ARGUMENT

### a.  This Court is the Proper Forum to Determine Arbitrability

This Court should grant this Motion, enter a preliminary injunction and enjoin the Blackwells from proceeding forward with the FINRA arbitration claim. The question before this Court is one of arbitrability, and this Court is the proper forum to determine arbitrability because questions of arbitrability are for the courts to decide "unless there is 'clear and unmistakeabl[e]' evidence that" the parties intended to arbitrate. First Options of Chicago, Inv. v. Kaplan, 514 U.S. 938, 944 (1995).

### b.  Each Element Necessary to Obtain a Preliminary Injunction is Satisfied

In order to obtain preliminary injunctions, the plaintiff carries the burden of establishing the following four elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that the failure to grant the temporary restraining order will result in the plaintiffs suffering immediate, irreparable injury; (3) the threatened injury outweighs any damage that the preliminary injunction will cause the opposing party; and (4) the preliminary injunction will not disserve the public interest.[2] See Allen v. School Board of Santa Rosa Co., 2011 WL 1058913, *13 (N.D. Fla. Mar. 21, 2011) (citing Scott v. Roberts, 612 F.3d

---

[2] The elements for obtaining a temporary restraining order are the same as the elements for obtaining a preliminary injunction. See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. King, 804 F. Supp. 1512, 1513 (M.D. Fla. 1992) (granting motion for temporary restraining order where broker dealer sought to enjoin an arbitration that was filed in an forum other than one of the fora set forth in the arbitration agreement).

1279, 1290 (11th Cir. 2010)) (granting motion for preliminary injunction). As set forth below, each of these four elements are satisfied.

### i.   The Plaintiffs Will Likely Succeed on the Merits

The Plaintiffs will likely succeed on the merits, satisfying the first element necessary to obtain the preliminary injunction sought here. Namely, the Plaintiffs will establish that the Blackwells possess no right to arbitrate any claim with the Plaintiffs. There are three reasons why the Plaintiffs will succeed on the merits, each is set forth in detail *infra*. First, no agreement to arbitrate exists. Second, the Blackwells are not "customers" of the Plaintiffs, and thus, cannot invoke the FINRA arbitration process. Third, even if arbitration was appropriate here, the Blackwells waived that right by actively participating in the lawsuit for one year and three months.

### 1.  No Agreement to Arbitrate Exists Between any of the Parties

Because the Plaintiffs and the Blackwells have not entered into an agreement to arbitrate any dispute, the Court must enjoin the arbitration from going forward. "Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to so submit." American Personality Photos, LLC v. Mason, 589 F. Supp. 2d 1325, 1329 (S.D. Fla. 2008) (quoting Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 82 (2002)). The Blackwells make absolutely no allegation, in the arbitration claim or anywhere else, that an agreement to arbitrate exists between the Blackwells and any of the Plaintiffs. See Exhibit C to the Complaint, Statement of Claim.  The reason is simple: no such agreement exists. See ICAP Capital Affidavit; ICAP Securities Affidavit; Sowa Affidavit at ¶ 7; Schmidt Affidavit at ¶ 7.  As such, because there is no agreement to

arbitrate, no right to arbitration exists here. See American Personality Photos, LLC v. Mason, 589 F. Supp. 2d 1325 (S.D. Fla. 2008) (citing Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 82 (2002)) (finding in the absence of an agreement to arbitrate, the party opposing arbitration could not be forced to arbitrate). In the absence of an agreement to arbitrate, Plaintiffs cannot be compelled to arbitration. The only exception would be if the Blackwells could compel arbitration pursuant to FINRA's rules. Unfortunately for the Blackwells, as set forth *infra*, they cannot satisfy this standard.

### 2. ICAP Capital Markets LLC is not Required to be a Member of FINRA

ICAP Capital is not a licensed member of FINRA (nor is it required to be so licensed). See ICAP Capital Affidavit. Because ICAP Capital is not a licensed member of FINRA and is not required to be, ICAP Capital is not subject to the FINRA rules and cannot be required to arbitrate in the FINRA Arbitration.

### 3. No FINRA rules or regulations provide for arbitration between the Blackwells and ICAP Securities

ICAP Securities is a member of FINRA. In order for the Blackwells to be able to compel ICAP Securities to participate in the FINRA arbitration claim, the Blackwells would have to establish they are a "customer" of ICAP Securities, a standard that the Blackwells cannot satisfy.

In order to compel arbitration under FINRA Rule 12200 in the absence of a written agreement to do so, the Blackwells would have to qualify as a "customer" of ICAP Securities, a FINRA member. FINRA Rule 12200 provides for arbitration if requested by a "customer" and "the dispute is between a customer and a member or associated person of a member; and the dispute arises in connection with the business activities of the member or

the associated person, except disputes involving the insurance business activities of a member that is also an insurance company."

FINRA does not define "customer," other than to exclude brokers and dealers from the definition of customer. FINRA Rule 12100. As a result, this Court must look to other precedent to determine whether a party qualifies as a "customer." See Hancock Life Ins. v. Wilson, 254 F.3d 48, 59 (2d Cir. 2001); Fleet Boston Robertson Stephens, Inc. v. INNOVEX, 264 F.3d 770, 772 (8th Circ. 2001). The definition of "'customer' should not be too narrowly construed, nor should the definition upset the reasonable expectations of FINRA members." Herbert J. Sims & Co. v. Roven, 548 F. Supp. 2d 759 (N.D. Cal. 2008). Courts have found a party to be a "customer" under the FINRA Rules where the party had "a business relationship with a FINRA member that is related directly to investment or brokerage services," or where such a member acted as the party's broker. JP Morgan Sec., Inc. v. Louisiana Citizens Prop. Ins. Corp., 2010 WL 1790061, *4 (E.D. La. May 3, 2010). A customer relationship may also be found where an associated person "induces or shepards" a party's investment. See Oppenheimer, 56 F.3d at 357.

In the case at bar, the Blackwells cannot invoke FINRA Rule 12200 to require the Plaintiffs to submit to arbitration of the Blackwells' claims because nothing indicates that the Blackwells would qualify as "customers" of ICAP Securities. See, e.g., Charles Schwab & Co. v. Reaves, 2010 WL 447370, *5 (D. Ariz. Feb. 4, 2010) (enjoining FINRA Arbitration based on non-"customer" status). Indeed, for several reasons, ICAP Securities (and ICAP Capital) did not have any form of business relationship with the Blackwells. See ICAP Capital Affidavit; ICAP Securities Affidavit.

First, Kleemann was <u>not</u> employed by ICAP Securities, a FINRA Member. Kleemann was employed by ICAP Capital. ICAP Capital, an intermediary between banks in non-regulated markets such as spot foreign exchange, is not subject to FINRA rules. <u>See</u> *ICAP Securities' Dispositive Motion for Summary Judgment and Incorporated Memorandum of Law ("ICAP MSJ"), attached hereto as **Exhibit "H."**  <u>See also</u> ICAP MSJ, at Exh. 12 at 3; Exh. 13 at 3; Exh. 9 at 9, 11; *and* Exh. 1 ¶ 6, 7); ICAP Securities Affidavit.[3]

Second, Plaintiffs did not have anything to do with the JPA and SAIC, the investments at issue. <u>See</u> ICAP Capital Affidavit; ICAP Securities Affidavit.  Again, ICAP Securities and ICAP Capital are inter-dealer brokers; they do not conduct business with individuals, such as the Blackwells. <u>See</u> ICAP Capital Affidavit; ICAP Securities Affidavit. Neither Kleemann nor the Plaintiffs ever solicited the Blackwells' participation in the JPA or the SAIC. <u>See</u> Kleemann Affidavit at ¶¶ 5, 6; ICAP Securities Affidavit; ICAP Capital Affidavit.  The Plaintiffs have not and did not sell the JPA and the SAIC to any company, and the Plaintiffs did not receive any compensation from the sale of the JPA and the SAIC to the Blackwells. <u>See</u> ICAP Capital Affidavit; ICAP Securities Affidavit.  Additionally, the Blackwells' payments for the investments were not deposited into an ICAP account.  Rather, the payments were sent to accounts established for the benefit of MerrickGlenn Associates, LLC ("**MerrickGlenn**"), an entity controlled by Kleemann. <u>See</u> ICAP MSJ at Exh. 3 at 37-38, Exh. 6 at 5-8. In short, like the defendants in <u>Herbert J. Sims</u>, 548 F. Supp. 2d at 764, the

---

[3] In fact, Kleemann was not working in the course and scope of his employment and/or agency for ICAP Securities and ICAP Capital during the sale of the investments at issue. <u>See</u> ICAP MSJ, at Exh. 12 at 3, Exh. 13 at 3, Exh. 9 at 9, 11, and Exh. 1 ¶ 6, 7.

Blackwells did not invest directly with the Plaintiffs. See ICAP Securities Affidavit; ICAP Capital Affidavit; Kleemann Affidavit at ¶¶ 5, 6.

Finally, the Blackwells' relationship was with MerrickGlenn, not the Plaintiffs. Indeed, to the extent that the Blackwells contend that they were "customers" of Kleemann (and therefore, somehow construed as "customers" of ICAP Securities based upon some form of "agency" theory), the Blackwells' own testimony unequivocally demonstrates that the relationship was between the Blackwells and MerrickGlenn. Indeed, the Blackwells, and Kleemann, testified:

1. Terry Blackwell learned about the investments from Frank Mooney, a Plaintiff in a related case. See ICAP MSJ at Exh. 3 at 16-18.

2. Upon speaking with Kleemann concerning the investments, Terry Blackwell learned of the companies actually involved in the investment contracts, namely, MerrickGlenn Associates LLC ("MerrickGlenn") and Agape Merchant Advance, LLC ("Agape"). See ICAP MSJ at Exh. 3 at 19, 21-22.

3. Beverly Blackwell never spoke with Kleemann concerning the investments. She only communicated with her husband, Terry Blackwell, concerning the investments and together, they decided make the investments at issue. See ICAP MSJ at Exh. 3 at 33, Exh. 7 at 12.

4. Beverly Blackwell conducted researched into MerrickGlenn and Agape. She did not recall conducting any investigation or research into "ICAP." See ICAP MSJ at Exh. 3 at 34-35; Exh. 7 at 23-24.

5. The investments were made by and between Blackwells, on the one hand, and MerrickGlenn and Agape, on the other. See ICAP MSJ at Exh. 3 at 21-22, 28, 37-38, Exh. 4 at 6-12, Exh. 6 at 5-8, Exh. 7 at 14.

6. MerrickGlenn and Agape are not related in any way to ICAP. See ICAP MSJ at Exh. 1 at 2, Exh. 11 at 13.

7. All of the Blackwells' monies for purchase of the investments were wired to MerrickGlenn. See ICAP MSJ at Exh. 3 at 37-38, Exh. 6 at 5-8.

8. According to phone records, all of Terry Blackwell's conversations concerning the investments were conducted on Kleemann's personal cellular phone. Exh. 3 at 24, 26. There is no evidence that the Blackwells' contacted an ICAP Securities phone number concerning the investments, and the Blackwells concede that they spoke with Kleemann only concerning the investments. See ICAP MSJ at Exh. 3 at 32-33, Exh. 5 at 1-3, Exh. 8 at 19-20, Exh. 9 at 4.

9. The investment contracts were signed by the Blackwells and faxed to a non-ICAP telephone number. See ICAP MSJ at Exh. 5 at 1-3.

10. During the course of the investments, the Blackwells received distributions from the investments. See ICAP MSJ, at Exh. 3 at 38. There is no evidence that any of these distributions were paid by ICAP Securities.

11. The only form of communications received by the Blackwells with the "ICAP" name on them were a few emails from Kleemann's "ICAP" email address. See ICAP MSJ, at Exh. 3 at 29-30, 33, 35-36, 38, Exh. 7 at 14, 20-21, Exh. 9 at 4. Of the limited emails and documents that Plaintiffs received from Kleemann's "ICAP" email address, at least one of those emails from Kleemann includes a MerrickGlenn signature block, and the attachments to those emails included the MerrickGlenn investment contracts at issue. See ICAP MSJ, at Exh. 3 at 30; Exh. 6 at 1-4.

12. The Blackwells did not receive any "ICAP" account statements or correspondence concerning the investments. See ICAP MSJ, Exh. 3 at 33; Exh. 7 at 14, 20-21; Exh. 9 at 4.

13. The Blackwells did not receive an "ICAP" business card from Kleemann. See ICAP MSJ, at Exh. 3 at 40; Exh. 7 at 14, 21; Exh. 9 at 4.

14. Kleemann never advised the Blackwells that Kleemann was selling the investments on behalf of "ICAP." See ICAP MSJ, at Exh. 3 at 35; Exh. 7 at 18.

15. Kleemann did not solicit the Blackwells' participation in the JPA or SAIC. See Kleemann Affidavit.

16. Kleemann did not receive any compensation from Agape Merchant Advance, LLC, from the sale of the JPA or SAIC to the Blackwells. See Kleemann Affidavit.

In summary, there was no relationship between the Blackwells and ICAP Securities whatsoever, much less a business relationship of any type. As a result, the Blackwells could

not conceivably be considered "customers" ICAP Securities. See, e.g., JP Morgan Sec., Inc. v. Louisiana Citizens Prop. Ins. Corp., 2010 WL 1790061, *4 (E.D. La. May 3, 2010) (finding a party to be a "customer" under the FINRA Rules where the party had "a business relationship with a FINRA member that is related directly to investment or brokerage services," or where such a member acted as the party's broker). Although Kleemann was an employee of ICAP Capital, ICAP Capital is not subject to FINRA rules or FINRA arbitration. The only "relationship" the Blackwells had was through Perry Kleemann and with his personal, separate and distinct company, MerrickGlenn. Therefore, because the Blackwells were not "customers" of ICAP Securities, a FINRA member, (or Kleemann, for that matter) in connection with the sale of the investments at issue, ICAP Securities is not subject to arbitration under FINRA rules. On this issue, Plaintiffs will be successful on the merits.

### 4. Even if a right to arbitration existed, the Blackwells, waived the right to seek arbitration.

Even if the Court assumes that a right to arbitrate exists (which it does not), the Blackwells waived any such right, by initiating and substantially participating in the lawsuit for approximately one year and three months. Even where valid arbitration agreements exist, the right to arbitrate is waived where "a party seeking arbitration substantially participates in litigation to a point inconsistent with an intent to arbitrate and this participation results in prejudice to the opposing party." Morewitz v. The West of England Ship Owners Mut. Protection & Indemnity Ass'n, 62 F.3d 1356 (11th Cir. 1995); see In re Merrill Lynce Auction Rate Sec. Litig., 2010 WL 532855, *3 (S.D.N.Y. Feb. 8, 2010) ("[E]leven months elapsed between LSED's initial filings in state and federal court and the filing of the instant

motion to compel arbitration. During these eleven months LSED expressed its desire to litigate rather than arbitrate."), *affirmed by* <u>Louisiana Stadium & Exposition District v. Merrill Lynch, Pierce, Fenner & Smith Inc.</u>, 626 F.3d 156 (2d Cir. 2010).[4] Forcing a party opposing arbitration, like the Plaintiffs here, to incur the types of expenses in litigation that arbitration was designed to alleviate may result in waiver. See <u>Morewitz</u>, 62 F.3d 1356 (finding waiver); <u>Louisiana Stadium & Exposition District</u>, 626 F.3d 156, *affirming* <u>Merrill Lynch Auction Rate Sec. Litig.</u>, 2010 WL 532855, *3. Additionally, the "use of pretrial discovery procedures by the party seeking arbitration may sufficiently prejudice the legal position of the opposing party so as to constitute a waiver of the party's right to arbitration" (assuming such a right existed). <u>Stone v. E.F. Hutton & Co.</u>, 898 F.2d 1542 (11th Cir. 1990). Here, the Blackwells instituted litigation machinery, causing the Plaintiffs to incur the types of expenses arbitration is designed to alleviate and forcing the Plaintiffs to engage in substantial pretrial discovery through the lawsuit, thus prejudicing the Plaintiffs' position. See, e.g., Ewusiak Affidavit, at ¶¶ 4-17. All of this was done over the course of one year and three months before the lawsuit was dismissed.

The extraordinary length of time that the Blackwells expended in litigating the lawsuit before its dismissal is sufficient enough evidence – in itself -- to result in waiver of the right to arbitrate, if such right existed. Courts within the Eleventh Circuit have

---

[4] Note that recently, the Supreme Court of the United States granted certiorari to hear an appeal from the Eleventh Circuit decision in <u>Citibank, N.A. v. Stok & Associates, P.A.</u>, 2010 WL 2825491 (11th Cir. July 20, 2010), based upon a conflict in the Circuits concerning the elements necessary to establish waiver. At issue in the appeal is the standard that must be established to determine whether a party has waived the right to arbitrate; namely, whether a party must establish prejudice in order to establish waiver of the right to arbitrate. See Petition for Certeriori in <u>Stok & Associates, PA v. Citibank, N.A.</u>, attached hereto as **Exhibit "I."** As argued herein, the Plaintiffs have clearly established prejudice.

determined the right to arbitrate was waived in cases where a party sought arbitration after litigation for periods of time significantly shorter than the one year and three month period exhausted by the Blackwells here.  By way of example, waiver of the right to arbitrate has been found where, before seeking arbitration, the party seeking arbitration participated in litigation for seven months (Lawrence v. Royal Carribean Cruises, Ltd., 2009 WL 4546633 (S.D. Fla. Nov. 30, 2009)), eight months (S&H Contractors v. AJ Taft Coal Co., 906 F.2d 1507 (11th Cir. 1990)), and eleven months (TOK v. Royal Carribean Cruises, 2010 WL 1433175, *2 (S.D. Fla. Apr. 9, 2010); Louisiana Stadium & Exposition District v. Merrill Lynch, Pierce, Fenner & Smith Inc., 626 F.3d 156 (2d Cir. 2010), *affirming* Merrill Lynce Auction Rate Sec. Litig., 2010 WL 532855, *3 (S.D.N.Y. Feb. 8, 2010) ("[E]leven months elapsed between LSED's initial filings in state and federal court and the filing of the instant motion to compel arbitration. During these eleven months LSED expressed its desire to litigate rather than arbitrate.").

In fact, as noted by the Southern District, "[w]hen litigation approaches one year, the Eleventh Circuit and this Court have found waiver appropriate." TOK v. Royal Caribbean Cruises, 2010 WL 1433175 (S.D. Fla. Apr. 9, 2010).  Furthermore, in each of the cases listed above, waiver was found where (a) the case was litigated for substantially shorter period of time than the Blackwells litigated the lawsuit; and (b) arbitration was sought before the court in those cases entered final judgment against the party seeking arbitration, which was the case with the Blackwells.  The mere length of time spent actively litigating the case alone supports a finding of waiver.

Even more than the sheer length of time the lawsuit was litigated, however, the extent to which the Blackwells participated in discovery and the litigation itself further supports a finding that the Blackwells waived any right to arbitration. Prejudice has been found where the party seeking arbitration invoked "litigation machinery" during the pendency of the lawsuit. TOK v. Royal Carribean Cruises, 2010 WL 1433175 (S.D. Fla. Apr. 9, 2010).[5] Courts have found waiver when the party seeking arbitration utilized litigation machinery, even where discovery has not occurred. Louisiana Stadium & Exposition District, 626 F.3d at 159-60 (waiver found where the party seeking arbitration litigated, but did not participate in any discovery, for eleven months).  Here, waiver is far more obvious where the Defendants served Rule 26 disclosures, filed and defended motions, conducted depositions, and responded to and took discovery. See Ewusiak Affidavit at ¶¶ 8-11.

For example, in Lawrence v. Royal Carribean Cruises, Ltd., 2009 WL 4546633 (S.D. Fla. Nov. 30, 2009), the party seeking arbitration waived that right after participating in significant discovery, including requests for production and interrogatories. Just as the party seeking arbitration in Lawrence waived the right to arbitrate through substantial participation in discovery, the Blackwells also waived the right to arbitrate through its discovery participating, including: serving (and ICAP Securities responding to) a total of seventeen

---

[5] Merrill Lynch Auction Rate Sec. Litig., 2010 WL 532855, *3, *affirmed by* Louisiana Stadium & Exposition District, 626 F.3d 156 ("Here, however, LSED did far more than merely file a complaint and instead pursued litigation in multiple fora. LSED took the initiative in filing a complaint in federal court and then amending it twice.... Following removal of the state case to the federal court and its consolidation with the federal case, LSED stipulated to a scheduling order that resulted in Merrill Lynch's submitting a nineteen-page, single-spaced letter detailing perceived deficiencies in LSED's second amended complaint. Merrill Lynch filed an answer to the third amended complaint and has indicated that it is presently preparing a motion for judgment on the pleadings, which is due on February 8, 2010. ... These activities illustrate LSED's unmistakable intent to litigate rather than arbitrate its claims against Merrill Lynch.").

separate interrogatories, seven requests for admissions, and twenty separate requests for production. See Ewusiak Affidavit at ¶¶ 9-10. The Blackwells further responded to interrogatories, requests for production and requests for admissions, and ICAP Securities took the depositions of both Mr. and Mrs. Blackwell. See Ewusiak Affidavit at ¶¶ 9-11. The Blackwells also responded to motions to dismiss, and motions for summary judgment, filed in the lawsuit.

Here, prejudice to the Plaintiffs is further demonstrated by the fact that trial was set in the lawsuit and ICAP Securities had begun necessary trial preparation, including the preparation of witness and exhibit lists. See Ewusiak Affidavit at ¶¶ 12-13. Where trial is set and preparations for trial are underway, as they were in the lawsuit, prejudice results to the party opposing arbitration and a finding of waiver of the right to arbitrate is warranted. TOK, 2010 WL 1433175, *2; Louisiana Stadium & Exposition District, 626 F.3d at 160.[6] Furthermore, ICAP Securities paid over $75,000.00 in legal fees and costs in defending and litigating the lawsuit and a related lawsuit filed in the same Court. [Case No. 5:09-cv-277]; see Ewusiak Affidavit at ¶¶ 7, 17; ICAP Securities Affidavit; ICAP Capital Affidavit.

In all, the law suit was litigated for one year and three months. This Court granted ICAP Securities' and Kleemann's motion to dismiss, but not until after the parties exchanged

---

[6] Merrill Lynch Auction Rate Sec. Litig., 2010 WL 532855, *4, affirmed by Louisiana Stadium & Exposition District v. Merrill Lynch, Pierce, Fenner & Smith Inc., 626 F.3d 156 (2d Cir. 2010) (finding Merrill Lynch demonstrated it would suffer prejudice if forced to arbitrate and stating: "Prejudice 'refers to the inherent unfairness-in terms of delay, expense, or damage to a party's legal position-that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue.' Merrill Lynch has expended significant resources in removing the state court action to federal court, moving to transfer the action to this court, moving to stay the proceedings pending the MDL Panel's decision, submitting a letter addressing the perceived deficiencies in LSED's complaint, filing an answer to the third amended complaint, and preparing to file a motion for judgment on the pleadings.") (internal citations omitted).

multiple interrogatory requests, requests for production and requests for admissions, and participated in depositions and extensive motion practice. The Plaintiffs successfully filed a motion to remove the lawsuit from state to federal court, a motion to dismiss and memorandum in support thereof, a motion for summary judgment, and a response to the Blackwells' objection to the Court's granting of the motion to dismiss. All of this occurred over the course of one year and three months and all of it occurred approximately twenty months before the Plaintiffs ever even attempted to engage in arbitration. The Plaintiffs have been unable to locate a case with facts that more clearly demonstrate prejudice to the party opposing arbitration and waiver by the party seeking arbitration than the facts before this Court. As such, even if the right to arbitrate existed, the Blackwells clearly waived that right.

For the reasons set forth *supra*, there is a substantial likelihood that the Plaintiffs will prevail on the merits and establish that the Blackwells do not possess a right to pursue the FINRA arbitration claim. The Blackwells' delinquent attempt to circumvent the Court's ruling in the lawsuit must not be condoned.

ii.     **There is a Substantial Threat that Failure to Grant the Preliminary Injunction will Result in the Plaintiffs Suffering Immediate, Irreparable Injury**

Absent an injunction, the Plaintiffs will be irreparably harmed; the Plaintiffs should not be forced to participate in the FINRA arbitration claim. Time and resources expended in arbitration are not compensable by monetary award. As the court in Herbert J. Sims & Co., 548 F. Supp. 2d at 766, a case where the court granted an injunction to stay arbitration, stated:

> Plaintiff also asserts that it will suffer irreparable harm if the arbitration brought by Defendants is not stayed because Plaintiff has no adequate remedy

> at law to recover the monetary and human capital it would expend defending
> itself in arbitration. . . . The Court therefore finds that Plaintiff has shown that
> it is possible it will suffer irreparable harm.

Because the Plaintiffs here, like the plaintiffs in <u>Herbert J. Sims & Co.</u>, will be unable to

recover the monetary and human capital expended in defending itself in an arbitration (which

is compounded by the fact that Plaintiffs already expended substantial sums in attorneys fees

and human capital in defending the prior lawsuit), the Plaintiffs will be irreparably harmed

absent the entry of a preliminary injunction. Moreover, if the preliminary injunction is not

granted, the Plaintiffs will also be required to defend themselves in a forum to which they did

not agree to resolve their disputes and incurring additional costs to defend themselves in the

state of Florida, in contravention of the Federal Court's ruling. <u>See</u> <u>Merrill Lynch, Pierce,</u>

<u>Fenner & Smith, Inc. v. King</u>, 804 F. Supp. 1512, 1515 (M.D. Fla. 1992) (finding broker-

dealer would suffer irreparable injury if forced to arbitrate in a forum other than one of the

fora agreed to in the arbitration agreement).

### iii. The Threatened Injury to the Plaintiffs Substantially Outweighs Any Damage that the Injunction May Cause the Blackwells

Without question, the Plaintiffs will suffer irreparable harm if a preliminary

injunction is not entered, whereas the Blackwells will not likely suffer any harm if the Court

enjoins them from proceeding with their claims in arbitration. By forcing the Plaintiffs to

participate in an arbitration that they did not consent to or contract for after spending

significant time and monies successfully litigating this matter previously, will absolutely

cause substantial damage and prejudice to the Plaintiffs. On the other hand, the Blackwells

can simply bring their claims in a court of competent jurisdiction against the proper parties.

iv.   **The Granting of the Preliminary Injunction Will Not Disserve or be Adverse To the Public Interest**

Finally, the granting of a preliminary injuction here will not disserve or be adverse to the public interest. This is a private matter between the Plaintiffs and the Blackwells and granting the preliminary injunction will in no way impact the public.

## III.   CONCLUSION

The Plaintiffs are entitled to a preliminary injunction enjoining the Blackwells from pursuing their FINRA arbitration claim. [7] The Plaintiffs are likely to prevail on the merits because no arbitration agreement exists between the Plaintiffs and the Blackwells, the Blackwells are not "customers" of the Plaintiffs such that the Plaintiffs would be required to arbitrate under FINRA rules, and even if the claim were arbitrable, the Blackwells waived any right to arbitrate by initiating and actively participating in litigation of the lawsuit for one year and three months.

Accordingly, the Plaintiffs respectfully request that the Court:

(1) Enjoin the Blackwells from proceeding forward with the FINRA arbitration claim;

(2) Stay all proceedings in the FINRA arbitration claim;

(3) Grant such further relief deemed just and proper under the circumstances.

---

[7] The Court need not conduct a hearing on the request for the preliminary injunction where, as here, all material facts set forth in the court record. See Wachovia Securities, LLC v. Raifman, 2010 WL 4502360, * 1 (N.D. Cal. Nov. 1, 2010) (In a case similar to the case at bar, upon granting a FINRA Firm's Motion for Preliminary Injunction to enjoin the claimants from pursuing a FINRA arbitration case, the "Court, in its discretion, [found] [the] matter suitable for resolution without oral argument. *See* Fed.R.Civ.P. 78(b).") (italics in original); see also Local Rule 4.05.

Dated:    June __3__, 2011.

FORIZS & DOGALI, P.A.

Joel J. Ewusiak
Fla. Bar No.: 0509361
Haley R. Maple
Fla. Bar No.: 0672963
4301 Anchor Plaza Parkway, Suite 300
Tampa, FL  33634
Telephone: (813) 289-0700
Facsimile:  (813) 289-9435
**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing has been furnished by U.S. Mail

this __3__ day of June, 2011, to:  Stephen D. Spivey, Esquire, 3610 East Fort King Street,

Ocala, FL  34470, counsel for Defendants.

Joel J. Ewusiak